788 So.2d 578 (2001)
STATE of Louisiana
v.
Marvin M. WALLACE.
No. 00-KA-1745.
Court of Appeal of Louisiana, Fifth Circuit.
May 16, 2001.
*580 J. Rodney Baum, Louisiana Appellate Project, Baton Rouge, LA, Counsel for Marvin M. Wallace, Defendant-Appellant.
Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Allison Wallis, (Appellate Counsel), Douglas Freese, Joe Roberts, (Trial Counsel), Assistant District Attorneys, Gretna, LA, Counsel for the State of Louisiana, Plaintiff-Appellee.
Marvin Wallace, Appellant, pro se.
Panel composed of Judges SOL GOTHARD, SUSAN M. CHEHARDY and WALTER J. ROTHSCHILD.
CHEHARDY, Judge.
Marvin M. Wallace appeals his conviction of forcible rape and his subsequent adjudication as a third-felony offender. We affirm, but remand for correction of two patent errors.
On April 21, 1999 the Jefferson Parish District Attorney filed a bill of information that charged Marvin Wallace with violation of La.R.S. 14:42.1 by the forcible rape of a 16-year-old juvenile male on February 25, 1999. Wallace entered a plea of not guilty at arraignment and later filed numerous pre-trial discovery motions, including motions to suppress evidence and identification that were denied.
The defendant underwent trial by a jury on October 27-28, 1999. On the first day of trial, the State filed a motion in limine to exclude any evidence that the victim made prior sexual assault allegations that were false. The motion was granted by the trial court. At the trial's conclusion, the jury returned a verdict finding the defendant guilty as charged.
On November 19, 1999 the court sentenced the defendant to serve 35 years' *581 imprisonment at hard labor, with credit for time served, without benefit of parole, probation or suspension of sentence for the first two years. On the same day, the State filed a multiple offender bill under La.R.S. 15:529.1, charging the defendant as a fourth-felony offender. The defendant denied the allegations of the multiple bill.
The District Attorney amended the multiple bill on April 28, 2000 to reflect the correct dates and case numbers.[1] On that date, after a hearing on the multiple bill, the trial court found the defendant to be a third felony offender. The court vacated the prior sentence and imposed the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.

FACTS
The following facts are summarized from the testimony of various witnesses:
On February 20, 1999 J.L., a 16-year-old boy, had a fight with his mother because she refused to let him go to a party. J.L. had been suspended from school and his mother had grounded him for the suspension at the time of this fight. J.L. had been disciplined by the school on several occasions; each time, he had received punishment at home. He became angry with his mother on February 20, 1999 and left home. J.L. had run away from home twice before, but had returned in a day. This time, J.L. was away from home from February 20 to February 25, 1999. After he was missing for a day, his mother notified the police.
On the first night away from home, J.L. stayed at the home of a friend's aunt. On the second night, he stayed with a second friend. Thereafter, J.L. called a female friend, C., and told her that he had been put out of the house because his mother was angry about his suspension from school. C.'s mother, Miriam Midence, put J.L. in a Days' Inn motel located on Veterans Highway. She paid for seven nights and gave the boy money for food. The boy called Midence each day. On the second day at the motel, Midence drove the boy to McDonald's to buy food. On the third day, she bought him chicken. Each day she would urge the boy to call his parents. Midence told J.L. not to go out of the motel because it was dangerous.
On February 24, 1999, after talking on the phone and watching television, J.L. went to the E-Z Serve gas station and convenience store across from the motel to get something to eat. He met Marvin Wallace near the store and Wallace asked him if he was "Josh." J.L. replied that Josh is his brother. J.L. asked Wallace to buy him a beer. At the E-Z Serve, where Wallace had previously worked, Wallace purchased two beers and gave one to J.L. Wallace spoke with Tanya Thomas, a former co-worker at the E-Z Serve. J.L. and Wallace got in Wallace's car, Wallace gave the boy the beer, and Wallace then drove J.L. to Wallace's house at 124 Diane Street in St. Rose, Louisiana.
J.L. and Wallace went inside and Wallace showed J.L. around. Two of Wallace's friends arrived and Wallace lifted weights with them. They remained at Wallace's house for 30-45 minutes. Wallace poured a cup of liquor, which he *582 shared with J.L. Wallace borrowed a friend's vehicle to take J.L. to the motel.
On the way to the motel, Wallace stopped at his mother's house for about 20 minutes. Wallace got out at the house and J.L. stayed in the car. The pair then proceeded to the E-Z Serve, where Wallace bought a bottle of rum. At some time during the evening, J.L. had shown Wallace his pocketknife.
When the pair arrived at the motel, J.L. said that he was going inside. Wallace told him he was going to smoke some marijuana and then leave. However, Wallace followed J.L. into the motel room and told the boy to sit on the bed. Wallace gave the boy rum and marijuana. J.L. felt disoriented and went to the bathroom to vomit. J.L. lay across the bed. Wallace sat on the bed and, after drinking and smoking, he lay next to J.L. Wallace then lay on top of J.L., grabbed him by his throat, and removed J.L.'s pants. Screaming and pleading for his life, the boy slid down to the floor; Wallace put him back on the bed and held a pocketknife to his throat.
Wallace raped J.L. anally, then sat on his throat and ordered J.L. to perform oral sex. Wallace was wearing a condom at the time of this incident. J.L. went to the bathroom again and vomited once more. Wallace then placed him on the bed and again raped the boy anally. J.L. then vomited in the bed. Thereafter Wallace dressed and left the motel. According to J.L., he feared for his life and felt that his assailant would have killed him if he had not submitted to the rape.
Between 1:00 a.m. and 2:00 a.m. on the morning of February 25, 1999, J.L. called his girlfriend and told her that he had been raped. He was upset, crying, and asked her not to tell anyone. His girlfriend was afraid that J.L. would hurt himself, so she told J.L.'s mother's best friend, Madalena, of the incident.
At approximately 9:00 a.m. that day, J.L. called Miriam Midence and asked her to drive him to his Aunt Madalena's house. Midence picked up J.L. and drove him as he requested. When J.L. arrived at his aunt's house she was crying, so he knew she was aware of the rape. Madalena called J.L.'s mother and told her to come over because her son had been raped. When J.L.'s mother arrived, J.L. was crying and shaking and he wanted to kill himself. His mother told the boy that the incident needed to be reported to the police. J.L. was afraid because his assailant had threatened to kill the boy's family if they reported the incident to the police.
At approximately 12:07 p.m. on February 25, 1999, the victim, his mother and stepfather went to the Criminal Investigation Division of the Kenner Police Department. Kenner Police Detective Chad Jacquet met them. He took the rape report. The victim told the police that someone named "Marvin" raped him. The victim provided a description of his assailant that included height, weight and identifying factors, such as his gold tooth and a tattoo on his chest that read "Thelma". A photo lineup was presented that contained a photograph of Marvin Wallace; the victim selected this photograph from the lineup as being the person who had raped him.
J.L. was transported to Children's Hospital and was examined by Dr. Scott Benton, a clinical pediatric forensic specialist. The boy was found to have some evidence of trauma, possible trace evidence of seminal fluid on his mid-upper back, and a linear abrasion of the right shoulder. There were no tears or abrasions of the anus. No other physical evidence of assault was found. Dr. Benton noted that it is not unusual not to find anal tearing, as the sphincter is designed to open and dilate. *583 He further explained that seminal fluid would not be found if a condom were used and oral sex would not produce physical findings.
Detective Michael Cunningham of the Kenner Police Department was dispatched to the motel room J.L. had formerly occupied. He found the room had been partially cleaned. No condoms were found, nor was a knife recovered. The room was processed for fingerprints, but none were found. The bedspread, blanket and mattress pad were retrieved, but the test results were inconclusive.
J.L. was transported to Wallace's street in St. Rose and was able to identify Wallace's house. Police executed a search warrant was executed on the defendant's house and seized condoms and green vegetable matter. A search of Wallace's mother's house produced no evidence.
According to Tanya Thomas, she received a call from Wallace about a week after this incident. He told her that he knew the boy and his father and that the boy was in trouble. Wallace asked Thomas if anyone had been there at the E-Z Serve asking questions about him. He instructed Thomas to deny seeing him with the youth.
Marvin Wallace testified on his own behalf as follows: He denied raping or sexually assaulting J.L. He testified that on February 24, 1999, at approximately 4:00 p.m. he picked up his fiancée from work and they drove to their home in St. Rose. Wallace said he stayed home until between 7:30 p.m. and 8:00 p.m., when he left for his mother's house. Wallace got out of the car to make a phone call and then left for the E-Z Serve.
Wallace said he met J.L. at the E-Z Serve and bought him a beer. Wallace gave the boy a ride to the home of Wallace's mother. Wallace again got out at his mother's house to make a phone call. From here Wallace and the boy proceeded to the home of Wallace's cousin. The trio then went to the park. Thereafter, Wallace dropped off his cousin and proceeded home with J.L.
While they were at Wallace's house, a cousin of Wallace's fiancée arrived and the men went to the weight room in the house to work out. Wallace borrowed the cousin's car to transport J.L. back to the E-Z Serve. Wallace went into the E-Z Serve to get a bottle of rum to make drinks for himself and his fiancée. Wallace drove from there to his mother's house and then went home. According to Wallace, he last saw J.L. at the E-Z Serve. He felt the boy had serious problems and needed counseling.
Danette Jones, Wallace's fiancée, testified that the couple was together for the greater part of the night. According to Jones, on February 25, 1999 Wallace was away from the house between 8:30 p.m. and 12:30 a.m. because he was at his mother's house.
ASSIGNMENT OF ERROR NUMBER ONE
There was insufficient evidence to support a conviction of forcible rape and multiple offender against Marvin M. Wallace.
ASSIGNMENT OF ERROR NUMBER ONE (PRO SE)
The evidence presented was insufficient to support a multiple offender conviction against Marvin Wallace.
ASSIGNMENT OF ERROR NUMBER TWO (PRO SE)
The State failed to specify which conviction it intended to use in the bill of *584 information charging Marvin Wallace as a Multiple Offender.

Forcible Rape
The defendant contends that the evidence presented at trial was insufficient to convict him of the crime of forcible rape because the victim's testimony was not credible and there was no physical evidence to tie him to the crime. The State contends that the victim's testimony alone was sufficient to establish the elements of the crime of forcible rape.
The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 2788-2789, 61 L.Ed.2d 560 (1979).
"It is not the function of an appellate court to assess credibility or reweigh the evidence." State v. Rosiere, 488 So.2d 965, 968 (La.1986). It is the role of the fact-finder to weigh the respective credibilities of the witnesses, and the appellate court will not second-guess the credibility determinations of the trier of fact beyond making sufficiency evaluations under the Jackson standard of review. State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (1983). In the absence of internal contradiction or irreconcilable conflicts with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a conviction. State v. Stec, 99-633, p. 3 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787.
Louisiana's definition of rape includes the act of anal sexual intercourse with a male, when the act is committed without the person's lawful consent. La.R.S. 14:41(A). "Emission is not necessary and any sexual penetration ..., however slight is sufficient to complete the crime." La. R.S. 14:41(B). The crime of forcible rape occurs when the sexual intercourse is deemed to be without the victim's lawful consent "because it is committed when the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape." La.R.S. 14:42.1(A)(1).
Thus, the elements of forcible rape are (1) anal or vaginal sexual intercourse regardless of degree of penetration; (2) lack of consent of the victim; (3) a victim who was prevented from resisting by force or threat of physical violence; and (4) a victim who reasonably believed that resistance would not prevent the rape. State v. Alberto, 95-540 at p. 9 (La.App. 5 Cir. 11/28/95), 665 So.2d 614, 621-622, writ denied, 95-1677 (La.3/22/96), 669 So.2d 1222 and 96-0041 (La.3/29/96), 670 So.2d 1237.
Despite absence of scientific evidence of sexual intercourse, the testimony of the victim can be sufficient to establish sexual penetration. State v. Rives, 407 So.2d 1195, 1197 (La.1981).
In this case the testimony of the victim and that of the defendant were in direct conflict. The jury, when faced with the conflict, apparently chose to believe the victim and the physician's explanation for the lack of physical evidence. This is a credibility determination. It is not the function of the appellate court to evaluate the credibility of witnesses, nor to overturn the trial court on its factual determination of guilt. State v. Gentras, 98-1095, p. 6 (La.App. 5 Cir. 3/30/99), 733 So.2d 113, 118, writ denied 99-1302 (La.10/15/99), 748 So.2d 464.
*585 We find that the State proved the elements of the crime of forcible rape beyond a reasonable doubt.

Multiple Offender
Defendant contends that the State failed to establish his identity at the hearing on the multiple offender bill. The State argues that the evidence presented was sufficient to establish identity.
The multiple offender bill alleged that, in addition to the present conviction for forcible rape, defendant had been convicted of felonies on three additional occasions. Specifically, on July 14, 1988 Wallace pleaded guilty to manslaughter and second degree murder, for which he was sentenced to serve 21 years at hard labor. On March 3, 1986 he pleaded guilty to being a felon in possession of a firearm and was sentenced to serve three years at hard labor. On April 30, 1984 he pleaded guilty to simple burglary and was given a five-year suspended sentence. The State alleged that Wallace was a fourthfelony offender.
If the defendant denies the allegations of the bill of information, the burden is on the State to prove the existence of the prior guilty pleas and that defendant was represented by counsel when they were taken. State v. Shelton, 621 So.2d 769, 779 (La.1993). La.R.S. 15:529.1 requires proof of an accused's alleged prior felony conviction as well as his alleged identity. State v. Curtis, 338 So.2d 662, 664.
Courts have recognized various methods of proof to establish identity, including testimony of witnesses, expert opinion as to the fingerprint comparisons, or photographs in the record. Curtis, 338 So.2d at 664. In this case, the State utilized documentary evidence and the testimony of the defendant's parole officer to establish identity of the defendant.
At the hearing on the multiple bill, the State offered into evidence four files regarding defendant's prior convictions. In particular, the State offered the entire record of Docket No. 99-2636, including the defendant's conviction for forcible rape. The record includes the defendant's sworn admission that he had been convicted of the crimes of manslaughter, simple burglary and being a felon in possession of a firearm and that he pleaded guilty to attempted second degree murder.
The State offered the certified conviction of the defendant for simple burglary that occurred on April 30, 1984 in Docket No. 83-483. The evidence consisted of certified copies of the bill of information, waiver of rights form, the commitment and arrest register and fingerprint sheet.
The State also offered the certified conviction of defendant for being a felon in possession of a firearm, in Docket No. 85-719, on March 3, 1986. The evidence consisted of certified copies of the bill of information, waiver of rights form, sentence and commitment arrest register and fingerprint sheet.
Finally, the State offered the certified conviction of the defendant for manslaughter and attempted second degree murder, in Docket No. 87-3598, which occurred on July 14, 1988. The evidence consisted of certified copies of the bill of information, a waiver of rights form, minute entry and commitment.
In proving the defendant's identity, the State offered the testimony of James Hurstin, a probation and parole officer who had supervised the defendant. Hurstin identified the defendant in open court. He testified that he had supervised the defendant when he was placed on parole in July 1998 for the crimes of attempted second degree murder, manslaughter and simple burglary. He verified that these convictions *586 were from Jefferson Parish and consisted of Docket Nos. 87-3598 and 83-3483. Hurstin had met personally with the defendant on at least two occasions, once on August 5, 1998 at the witness' office and on March 5, 1999, at the correctional center. He said that at the August 1998 meeting, the defendant produced identification. At the March 1999 meeting, defendant brought his parole certificate, which contained the docket numbers of his convictions. A copy of the certificate is also provided to the probation and parole board. Hurstin testified that he had no doubt that the defendant, whom he identified in court, was the same man he supervised on parole.
In finding that the State had proven the defendant's identity, the trial judge ruled that the State had met its burden of proving the defendant's identity. The court found that the testimony of the defendant's parole officer that he recognized defendant as the person he supervised for those particular charges was sufficient proof. The court found that Wallace is a habitual offender with a third offense felony conviction.
The State established the defendant's identity beyond a reasonable doubt. Accordingly, the trial judge did not err in finding the State proved the defendant's identity as the offender in the prior proceedings.
Defendant also contends that the State failed to specify which of two predicate offenses it sought to use to enhance sentencing, where the offenses arose out of a common incident and the convictions were obtained on the same day.
Convictions on more than one count entered on the same date should be treated as one conviction for applying the habitual offender statute. State v. Sherer, 411 So.2d 1050, 1057 (La.1982). Thus, only one count of a multi-count indictment/information can be used to enhance the penalty when the convictions are entered on the same day. State v. McIntyre, 496 So.2d 1204, 1207 (La.App. 5 Cir.1986).
Although the multiple bill refers to both a manslaughter conviction (La.R.S. 14:31) and an attempted second degree murder conviction (La.R.S. 14:27, 14:30.1) that occurred on July 14, 1988, it is clear from the record that the court used only the manslaughter conviction in finding the defendant to be a third felony offender. At the time of sentencing, the trial judge made the following comments:
I have no other sentence to give you except life imprisonment, but if I did have discretionWith all due respect, you've got convictions for rape, homicide and theft. I don't know what else you can do beside those things to warrant a life imprisonment sentence....
The record fails to support defendant's claims. We find no merit to Assignment of Error No. 1 and Pro Se Assignments of Error Nos. 1 and 2.
ASSIGNMENT OF ERROR NUMBER TWO
The court erred by denying the defendant the opportunity to present evidence that the victim had previously made false allegations of sexual assault against another person.
Defendant contends that the trial court erred when it granted the State's motion in limine to exclude evidence by the defendant that the victim had previously made false allegations of sexual assault. The State responds that the defendant failed to argue to the trial court the fact that the victim's previous complaints of sexual assault were false complaints. The State also argues that this evidence is hearsay and that, even if relevant, the *587 prejudicial effect outweighs the probative value.
When a defendant attempts to use evidence of a victim's false allegations of improper sexual behavior to impeach the victim's credibility, the rape shield statute does not apply. State v. Smith, 98-2045, p. 5 (La.9/8/99), 743 So.2d 199, 203; La. C.E. arts. 412, 607(C). The relevant inquiry in such cases is whether reasonable jurors could find, based on the evidence presented by defendant, that the victim had made prior false accusations. Smith, 743 So.2d at 203. Assuming that burden has been met, all other standards for the admissibility of evidence apply. Id.; La. C.E. arts. 403, 404, 607, 608 and 613.
In the case at bar, the trial court conducted a hearing on the motion in limine. At the hearing the State notified the court that it had subpoenaed school records and conducted a search of criminal complaints and it could find no reports by the victim of previous sexual abuse.
The defendant presented no evidence of the alleged false statement, other than to contend that the victim told the defendant he was abused at school. The defendant claimed that the victim's statement was not true and was, in fact, the excuse the victim used to explain why he missed so much school. The defendant further claimed that he was falsely accused of sexual assault because the victim was attempting to get out of trouble for missing school and running away from home. The defendant admitted to the court that he is the sole source of this information.
The trial court found the evidence inadmissible and granted the State's motion in limine.
The defendant's contention that the victim told him he was sexually abused at school, if proven, and shown to be false, is admissible under La.C.E. art. 607, which provides in pertinent part as follows:
A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
* * *
C. Attacking credibility intrinsically. Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
The statement allegedly made by the victim to the defendant, if proven and shown to be false, would be admissible to attack the victim's credibility under the Smith decision. See La.C.E. art. 607(C).
In Smith, the Supreme Court set out the test for admissibility of prior false allegations of sexual behavior as follows: "[W]hen considering the admissibility of such evidence, the question for the trial court is not whether it believed the prior statement was false, but whether reasonable jurors could find, based on the evidence presented by defendant, that the victim had made prior false accusations." 743 So.2d at 203.
In this case there was no proof that the alleged statements were made. The defendant's mere assertion that the alleged statement was made and that it was false does not satisfy the Smith test. The trial court correctly concluded that reasonable jurors could not find, based on the evidence presented by defendant, that the victim had made prior false accusations.
In Smith, the victim admitted that she made prior accusations of improper sexual behavior, that fact was corroborated by two witnesses, and at least one independent witness testified that the victim recanted *588 these accusations. 743 So.2d at 203. In this case, at a prior hearing the victim specifically denied making allegations of prior sexual abuse. We have only the defendant's assertion that the statement was made. Moreover, defendant admitted that it was merely his hypothesis that the alleged statement was false. Thus, the situation here is distinguishable from the facts in Smith.
Under these circumstances, the trial court did not err in granting the State's motion in limine. We find no merit to this assignment.
ASSIGNMENT OF ERROR NUMBER THREE (PRO SE)
The defendant respectfully requests the Court to review the record for error patent on the face of the record.
The record was reviewed for errors patent, according to La.C.Cr.P. art. 920. The review reveals two errors patent in this case, which may be corrected by remand and issuance of written notifications by the district court.
First, the trial court failed to properly comply with the notification requirements of La.C.Cr.P. art. 930.8 concerning the prescriptive period for filing applications for post conviction relief. At the sentencing the court stated, "Mr. Wallace, you have two years from today's date or from the time that your sentence and your conviction become final in order to file an application for post conviction relief." That statement was ambiguous as to the start of the post-conviction prescriptive period and should be corrected. State v. Williams, 98-651, p. 8 (La.App. 5 Cir. 2/10/99), 729 So.2d 14, 22.
We note, further, that the defendant was charged with and convicted of a "sex offense" as defined by La.R.S. 15:542(E). La.R.S. 15:540, et. seq. require registration of sex offenders. La.R.S. 15:543(A) requires that the court shall provide written notification to any defendant charged with a sex offense of the registration requirements of La.R.S. 15:542 by including the notice on any judgment and sentence forms provided to defendant. Here, however, the record does not indicate that the judgment and sentence forms contained the required written notification pursuant to La.R.S. 15:543(A). Like omission of the Art. 930.8 notification, this omission warrants a remand for written notification. State v. Stevenson, 00-1296 (La.App. 5 Cir. 1/30/01), 778 So.2d 1165, 1166-1167.
For the foregoing reasons, the defendant's convictions for forcible rape and as a third-felony offender are affirmed. The matter is remanded and the trial court is ordered to inform defendant of the correct provisions of La.C.Cr.P. art. 930.8 by sending appropriate written notice to defendant within ten days of rendition of this opinion and to file written proof in the record that defendant received such notice. The trial court is further ordered to inform the defendant of the registration requirements as provided in La.R.S. 15:543(A), by sending appropriate written notice to the defendant, within ten days of this Court's opinion, and to file written proof in the record that defendant received such notice.
AFFIRMED; REMANDED TO CORRECT PATENT ERRORS.
NOTES
[1] Where, as here, when the amendment is clerical only, and not substantive, no re-arraignment is necessary. See: La.C.Cr.P. art. 487; State v. Bluain, 315 So.2d 749, 752 (La.1975). We note, further, that the record before us does not contain a copy of the amended bill. However, the changes made in the amendment are set out in the transcript and the defendant has not raised the absence of a written copy of the amended bill on appeal.